SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
P. CRAIG CARDON, Cal Bar No. 168646
JAY T. RAMSEY, Cal Bar No. 273160
RANA SALEM, Cal Bar No. 358050
1901 Avenue of the Stars, Suite 1600
Los Angeles, California 90067-6055
Telephone:     310.228.3700
Facsimile:     310.228.3701
E-mail:        ccardon@sheppard.com
               jramsey@sheppard.com
               rsalem@sheppard.com

*Attorneys for Defendant*
Williams-Sonoma, Inc.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| KATIE O'MALLEY and MEGAN REILLY, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>        v.<br><br>WILLIAMS-SONOMA, INC.,<br><br>        Defendant. | Case No. 3:26-cv-01276-RFL<br><br>*Hon. Rita F. Lin*<br><br>**DEFENDANT WILLIAMS-SONOMA, INC.'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**<br><br>*Filed concurrently with Declaration of P. Craig Cardon and Declaration of David Smit*<br><br>Hearing Date: June 30, 2026<br>Time:        10:00 a.m.<br><br>Courtroom:   15/ 18th Floor<br><br>FAC Filed:    March 16, 2026<br>Trial Date:    Not Set |

SMRH:4896-2645-8531.6

**TO THE HONORABLE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD.**

**PLEASE TAKE NOTICE** that on June 30, 2026 at 10:00 a.m., or as soon thereafter as counsel may be heard, in Courtroom 15 on the 18th floor of the United States District Court for the Northern District of California, San Francisco Division, located at 450 Golden Gate Avenue, San Francisco, California 94102, the Honorable Rita F. Lin presiding, Defendant Williams-Sonoma, Inc. ("WSI") will, and hereby does, move to compel arbitration of and dismiss, or in the alternative stay, all claims asserted in the First Amended Complaint filed by Plaintiffs Katie O'Malley ("O'Malley") and Megan Reilly ("Reilly" and collectively with O'Malley, "Plaintiffs").

The Motion is made on the grounds that Plaintiffs should be compelled to arbitrate their claims against WSI in accordance with their respective agreements to do so.  The Motion is based on this Notice of Motion and Motion, the Declaration of P. Craig Cardon and exhibits thereto, the Declaration of David Smit and exhibits thereto, all pleadings and other materials in the Court's file for this action, those matters of which this Court may or must take judicial notice, and such other matters as the Court may consider.

Dated: April 24, 2026

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By     _/s/  P. Craig Cardon_
P. Craig Cardon
Jay T. Ramsey
Rana Salem

*Attorneys for Defendant*
Williams-Sonoma, Inc.

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION AND STATEMENT OF ISSUE ..............................................................1

II.   FACTS ...........................................................................................................................1

      A.    Plaintiffs' Allegations In The Complaint .....................................................1

      B.    Plaintiffs Agreed To Arbitrate Their Claims When They Made The Very Purchases Giving Rise To Their Claims ....................................................2

      C.    Plaintiffs Are Each Long-Time Customers Of WSI, Are Loyalty Members Of WSI, Made The Above Purchases While Logged In As Loyalty Members, And Have Made Numerous Other Purchases On WSI's Website, Including After The Purchases At Issue...............................................4

III.  THE COURT SHOULD COMPEL ARBITRATION .........................................................5

      A.    Legal Standard.............................................................................................5

      B.    A Valid Agreement To Arbitrate Exists.......................................................6

            1.    Plaintiffs Online Purchases ..............................................................9

            2.    Plaintiffs Are Loyalty Rewards Members.......................................13

      C.    The Disputes Fall Within The Scope Of The Arbitration Agreement .....................14

IV.   CONCLUSION ..........................................................................................................15

SMRH:4896-2645-8531.6

Case No. 3:26-cv-01276-RFL

MOTION TO COMPEL ARBITRATION

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*ABF Capital Corp. v. Osley*
411 F.3d 1061 (9th Cir. 2005).................................................................................. 6

*Asad v. Dick's Sporting Goods*
2024 U.S. Dist. LEXIS 50970 (C.D. Cal. Feb. 2, 2024) ........................................ 10

*AT&T Mobility LLC v. Concepcion*
563 U.S. 333 (2011) ......................................................................................... 5, 14

*Bender v. Twilio Inc.*
2025 WL 2308484 (N.D. Cal. Aug. 11, 2025).................................................... 8, 12

*Berman v. Freedom Fin. Network, LLC*
30 F.4th 849 (9th Cir. 2022)................................................................................*passim*

*Chabolla v. ClassPass Inc.*
129 F. 4th 1147 (9th Cir. 2025)........................................................................... 7, 8

*City-to-City Auto Sales, LLC v. Harris*
78 Va. App. 334 (2023).......................................................................................... 14

*Crawford v. Beachbody, LLC*
2014 WL 6606563 (S.D. Cal. Nov. 5, 2014) ......................................................... 12

*Dean Witter Reynolds Inc. v. Byrd*
470 U.S. 213 (1985) ................................................................................................ 6

*Dupler v. Orbitz, LLC*
2018 WL 6038309 (C.D. Cal. July 5, 2018) .......................................................... 12

*EFund Capital Partners v. Pless*
150 Cal. App. 4th 1311 (2007)............................................................................... 14

*Ehrmantraut v. Safeway Inc.*
732 F. Supp. 3d 1030 (D. Ariz. 2024).............................................................. 10, 11

*In re Facebook Biometric Info. Privacy Litig.*
185 F. Supp. 3d 1155 (N.D. Cal. 2016) ................................................................... 6

*First Options of Chicago, Inc. v. Kaplan*
514 U.S. 938 (1995) ................................................................................................ 6

*Ghazizadeh v. Coursera, Inc.*
737 F. Supp. 3d 911 (N.D. Cal. 2024) ........................................................ 10, 11, 12

*Gillam v. Branch Banking & Trust Co. of Va.*
  2018 WL 3744019 (E.D. Va. Aug. 7, 2018) ................................................................... 6

*Godun v. JustAnswer LLC*
  135 F.4th 699 (9th Cir. 2025) ..............................................................................*passim*

*Hansen v. Integrity Assets LLC*
  2021 WL 5999317 (C.D. Cal. Dec. 20, 2021) ............................................................. 6

*Hoffman v. Citibank, N.A.*
  546 F.3d 1078 (9th Cir. 2008) ................................................................................... 6

*Izzi v. Mesquite Country Club*
  186 Cal. App. 3d 1309 (1986) ................................................................................... 14

*Juhyun So v. Hyatt Corp.*
  2025 U.S. Dist. LEXIS 211395 (C.D. Cal. Aug. 25, 2025) ................................... 9, 13

*Keebaugh v. Warner Bros. Ent. Inc.*
  100 F.4th 1005 (9th Cir. 2024) ................................................................................ 7, 8

*Knutson v. Sirius XM Radio Inc.*
  771 F.3d 559 (9th Cir. 2014) .................................................................................... 6, 7

*Lee v. Ticketmaster L.L.C.*
  2019 WL 9096442 (N.D. Cal. Apr. 1, 2019), *aff'd*, 817 Fed. App'x. 393 (9th Cir. 2020)..... 12

*Lincoln v. MX Techs., Inc.*
  2024 WL 3274831 (E.D. Cal. July 2, 2024) ............................................................. 11

*Massel v. Successfulmatch.Com*
  2025 WL 2452371 (9th Cir. Aug. 26, 2025) ............................................................ 11

*Morales v. Lexxiom, Inc.*
  2010 WL 11507515 (C.D. Cal. Jan. 29, 2010) ......................................................... 14

*Morrison v. Yippee Ent., Inc.*
  2025 WL 2389424 (9th Cir. Aug. 18, 2025) ........................................................ 11, 13

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*
  460 U.S. 1 (1983) ....................................................................................................... 14

*Moule v. United Parcel Serv. Co.*
  2016 WL 3648961 (E.D. Cal. Jul. 7, 2016) .............................................................. 12

*Nail v. Lens.com, Inc.*
  2024 WL 3723912 (C.D. Cal. June 20, 2024) ................................................ 10, 11, 12

*Nanometrics, Inc. v. Optical Sols., Inc.*
  2019 U.S. Dist. LEXIS 35246 (N.D. Cal. Mar. 5, 2019) ........................................... 6

SMRH:4896-2645-8531.6
MOTION TO COMPEL ARBITRATION

*Nguyen v. Barnes & Noble Inc.*
    763 F.3d 1171 (9th Cir. 2014) ............................................................................................ 6

*Nielsen Contracting, Inc. v. Applied Underwriters, Inc.*
    22 Cal. App. 5th 1096 (2018) .............................................................................................. 5

*Oberstein v. Live Nation Entm't, Inc.*
    60 F.4th 505 (9th Cir. 2023) ........................................................................................*passim*

*Patrick v. Running Warehouse, LLC*
    93 F.4th 468 (9th Cir. 2024) ................................................................................. 10, 12, 13

*Pizarro v. QuinStreet, Inc.*
    2022 WL 3357838 (N.D. Cal. Aug. 15, 2022) ............................................................ 11, 12

*In re Ring LLC Priv. Litig.*
    2021 WL 2621197 (C.D. Cal. June 24, 2021) ..................................................................... 7

*Ross v. Shutterfly Lifetouch, LLC*
    2021 WL 4776666 (N.D. Cal. Oct. 13, 2021) ................................................................... 12

*Rushing v. Williams-Sonoma, Inc.*
    No. 25-5252 (9th Cir. Nov. 24, 2025) ............................................................................... 12

*Rushing v. Williams-Sonoma, Inc.*
    No. 16-cv-01421-WHO, 2025 WL 2391394 (N.D. Cal. Aug. 18, 2025) .............................. 12

*Sellers v. JustAnswer LLC*
    73 Cal. App. 5th 444 (2021) .............................................................................................. 14

*Simula, Inc. v. Autoliv, Inc.*
    175 F.3d 716 (9th Cir. 1999) ............................................................................................. 14

*Slaten v. Dick's Sporting Goods, Inc.*
    2024 WL 1136399 (C.D. Cal. Feb. 2, 2024) ............................................................ 10, 11, 12

*Snow v. Nectar Brand, LLC*
    2023 WL 2558544 (C.D. Cal. Mar. 2, 2023) ...................................................................... 11

*Tate v. Progressive Fin. Holdings*
    2017 U.S. Dist. LEXIS 176289 (C.D. Cal. Oct. 24, 2017) .................................................. 14

*United Trans. Union, AFL/CIO v. Southern Cal. Rapid Transit Dist.*
    7 Cal. App. 4th 804 (1992) ................................................................................................ 14

*White v. Ring LLC*
    2023 WL 1097554 (C.D. Cal. Jan. 25, 2023) ....................................................................... 7

*Wolitarsky v. Blue Cross of Cal.*
    53 Cal. App. 4th 342 (1997) .............................................................................................. 14

Statutes

9 U.S.C.
§ 2...................................................................................................................6
§ 4................................................................................................................6, 15

California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code
§ 1770(a)(9)...................................................................................................2
§ 1770(a)(29)(A) ...........................................................................................2

Federal Arbitration Act ("FAA"), 9 U.S.C.
§§ 1–16.......................................................................................................3, 5

Va. Code Ann.
§ 59.1-200......................................................................................................2
§ 59.1-608......................................................................................................2

## I. INTRODUCTION AND STATEMENT OF ISSUE

Plaintiffs Katie O'Malley ("O'Malley") and Megan Reilly ("Reilly") (collectively, "Plaintiffs") allege that Defendant Williams-Sonoma, Inc. ("WSI") somehow improperly advertised or charged certain Shipping and Processing fees in connection with their online purchases through WSI's website, www.williams-sonoma.com (the "Website").  WSI denies these claims, which are legally and factually unsupportable.  But this Court should not reach those issues because this case belongs in arbitration.  When O'Malley completed her July 11, 2025 purchase and when Reilly completed her July 14, 2025 purchase, both expressly agreed to WSI's Terms and Conditions (the "Terms").  The Terms contain a section titled "Arbitration Agreement & Waiver of Certain Rights," providing that "you and [WSI] agree that . . . we will resolve any controversies, claims, counterclaims, or other disputes between you and [WSI] or you and a third-party agent of [WSI] (a 'Claim') through final and binding arbitration instead of through court proceedings."

Plaintiffs' July 2025 purchases were not the first time that they agreed to these Terms, or the last.  Both Plaintiffs have purchased numerous items on WSI's portfolio of websites over the years, before and after the purchases at issue, and agreed to the Terms each time, which have contained an arbitration provision for over ten years.  Thus, not only are Plaintiffs bound to arbitrate based on the purchases giving rise to their claims, but they are also bound to arbitrate based on their long history with WSI and their long-time agreement to WSI's arbitration provision.  Accordingly, the Court must compel Plaintiffs to arbitration and dismiss the First Amended Complaint ("FAC").

## II. FACTS

### A. Plaintiffs' Allegations In The Complaint

Plaintiffs challenge certain Shipping & Processing fees charged by WSI on their purchases.  Plaintiffs allege that "consumers are quoted an artificially low price," only for WSI to later charge "a mandatory 'Processing' fee . . . *after* consumers input all their shipping and credit card information."  (FAC ¶ 2.)

O'Malley alleges that she made a purchase on the Website on July 11, 2025 for a home item "initially quoted" at $139.80.  (*Id.* ¶ 11.)  After clicking through screens and entering her information, WSI added a "Shipping & Processing Fee" of $24.00 without providing a breakdown

between "shipping" and "processing"; she alleges that the fee was mandatory because she could not complete her purchase without paying it.[1]  (*Id.*)  Reilly alleges that she made a single online purchase on the Website on July 14, 2025 for two home items "initially quoted" at $93.45 and $268.45, respectively.  (*Id.* ¶ 14.)  As with O'Malley, she alleges that after clicking through screens and inputting her information, WSI added a "Shipping & Processing Fee" of $55.00.  (*Id.*)

Based on their individual online transactions, Plaintiffs allege a nationwide class and subclass, a California class and subclass, and a Virginia class and subclass, and bring claims for alleged violations of California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1770(a)(29)(A) and (a)(9), Virginia Code § 59.1-608, and Virginia Code § 59.1-200.  (*Id.* ¶¶ 62-95.)

### B.    Plaintiffs Agreed To Arbitrate Their Claims When They Made The Very Purchases Giving Rise To Their Claims

To complete their respective July 2025 purchases, Plaintiffs were required to proceed through the Website's checkout process.  Declaration of David Smit ("Smit Decl.") ¶ 5.)  The process begins when a customer selects an item and clicks the "ADD TO CART" button, adding the item to the online shopping cart.[2]  (*Id.* ¶ 6, Ex. A at 1.) (exemplar of product page with "ADD TO CART" button).

After selecting items for purchase, Plaintiffs would have proceeded to their "Shopping Cart" to review their order.  (*Id.* ¶ 7.)  On WSI's current Shopping Cart page, the customer clicks the "CHECKOUT" button, which appears directly below a notice stating: "[b]y continuing with your purchase you agree to our terms and conditions and privacy policy."  The underlined phrase "terms

---

[1] This is wrong, as O'Malley could have avoided the "Shipping & Processing Fee" entirely by not having it shipped to her and electing to pick up the product at a store after purchasing it online.  But that will be an issue for the arbitrator to address.

[2] O'Malley alleges that she purchased a "Hold Everything Glass Liquid Soap & Lotion Dispenser, Clear, Set of 2" from WSI's website on July 11, 2025, (FAC ¶ 11,) but fails to specify whether she selected the "Free In-Store Pickup" or "Ship To Home" option.  WSI's records suggest that O'Malley made that purchase by credit card and had the order shipped to a residential address. (Smit Decl. ¶ 5.)  Reilly similarly alleges that she purchased a "Shun Combo Whetstone" and an "All-Clad D5 Stainless Steel Sauté Pan" from WSI's website on July 14, 2025, (FAC ¶ 14,) but likewise fails to specify her delivery method.  WSI's records indicate that Reilly also paid by credit card and had her order shipped to a residential address.  (Smit Decl. ¶ 5.)  As such, this Motion limits its discussion to the checkout flow for the "Ship To Home" option only.

and conditions" is a hyperlink that, when clicked, opens and displays the Website Terms.  (*Id.* ¶ 7, Ex. A at 2.)  WSI's previous Shopping Cart page, that was live from September 2020 through at least February 26, 2025, required the customer to click the "CHECKOUT" button, which appeared above the notice, stating:  "[b]y continuing with your purchase you agree to our terms and conditions and privacy policy."  (*Id.* ¶ 7, Ex. B at 1-2.)  As with the current Shopping Cart Page, the underlined phrase "terms and conditions" is a hyperlink that, when clicked, opens and displays the Website Terms.  (*Id.*)  In either scenario, the customer would have had to click the "CHECKOUT" button to move forward with the checkout process.  (*Id.*)  Based on WSI's records, O'Malley and Reilly saw one of the two "Shopping Cart" pages identified above.  (*Id.* ¶ 8.)  Regardless of which "Shopping Cart" page Plaintiffs' saw, the notice that appeared on Plaintiffs' screen was the first of **two** notices of the Terms that they received before completing their orders.  (*Id.*)

A customer that proceeds past the "Shopping Cart" is taken to the final order confirmation page.  (*Id.* ¶ 9.)  The statement "By placing an order, you are agreeing to our Privacy Policy, and Terms of Use" appears directly above the "Place Order" button that a customer must click to complete his or her purchase.  (*Id.*)  The underlined phrase "Terms of Use" is a hyperlink that, when clicked, causes the browser to open the Website Terms.  (*Id.*)

The Terms read, in relevant part:[] These Terms contain an arbitration provision.  Please review the Arbitration section for details . . .

### Arbitration Agreement & Waiver of Certain Rights

> You and Williams-Sonoma, Inc. agree that, except as set forth below, we will resolve any controversies, claims, counterclaims, or other disputes between you and Williams-Sonoma, Inc. or you and a third-party agent of Williams-Sonoma, Inc. (a "Claim") through final and binding arbitration instead of through court proceedings, in accordance with the Consumer Arbitration Rules of the American Arbitration Association ("AAA Rules"). . . . You and we hereby waive any right to a jury trial of any Claim. . . . The arbitrator's decision in any such arbitration will be final and binding upon the parties and may be enforced in any court of competent jurisdiction. The Federal Arbitration Act and federal arbitration law apply to this agreement. A court of competent jurisdiction will exclusively determine whether the parties have entered into a valid and enforceable agreement to arbitrate their Claims and the arbitrability of any Claim or counterclaim, including, without limitation, whether any conditions precedent to the commencement of an arbitration have been completely satisfied.

. . .

> Neither you nor Williams-Sonoma, Inc. may act as a class representative or private attorney general, nor participate as a member of a class of claimants, with respect to any Claim. You may not bring Claims in arbitration on a class or representative basis. The arbitrator can decide only your and/or Williams-Sonoma, Inc.'s individual Claims.

. . .

> The arbitrator may award in the arbitration the same damages or other relief available under applicable law, including injunctive and declaratory relief, as if the action were brought in court on an individual basis.

. . .

> THIS SECTION LIMITS CERTAIN RIGHTS, INCLUDING THE RIGHT TO MAINTAIN A COURT ACTION, THE RIGHT TO A JURY TRIAL, THE RIGHT TO PARTICIPATE IN ANY FORM OF CLASS OR REPRESENTATIVE CLAIM, THE RIGHT TO ENGAGE IN DISCOVERY EXCEPT AS PROVIDED IN AAA RULES, AND THE RIGHT TO CERTAIN REMEDIES AND FORMS OF RELIEF. OTHER RIGHTS THAT YOU OR WILLIAMS-SONOMA, INC. WOULD HAVE IN COURT ALSO MAY NOT BE AVAILABLE IN ARBITRATION.

(Smit Decl. ¶ 11, Ex. C.) (bold and capitalization in original).

**C.     Plaintiffs Are Each Long-Time Customers Of WSI, Are Loyalty Members Of WSI, Made The Above Purchases While Logged In As Loyalty Members, And Have Made Numerous Other Purchases On WSI's Website, Including After The Purchases At Issue**

Although omitted from the FAC, O'Malley and Reilly's purchase history indicate that they are long-time WSI customers and loyalty members.  Indeed, WSI's records reveal that O'Malley has been a loyalty rewards member since January 16, 2022, and has made thirteen (13) purchases while logged into her account online or with her account in store—including the July 11, 2025 online purchase at issue in this dispute.  (Smit Decl. ¶ 15.)  O'Malley has also made four (4) additional purchases while logged into her account after the July 11, 2025 transaction that triggered this action.  (*Id.*)  Reilly has an *even* longer history with WSI.  WSI's records show that Reilly enrolled in the loyalty rewards program on July 11, 2021, and has made four (4) purchases while logged into her account online or with her account in store—including the July 14, 2025 purchase at the center of

this dispute.  (*Id.* ¶ 16.)  Reilly has made one (1) additional purchase while logged into her account, after the July 14, 2025 transaction that triggered this action.  (*Id.*)

WSI's checkout flow has remained substantially the same throughout this period and would have required that both O'Malley and Reilly agree to the Terms multiple times in connection with their purchases online both before and after the purchases alleged in the FAC.  (*Id.* ¶ 17.)  And as loyalty rewards members, O'Malley and Reilly earned rewards from each of the transactions made while logged into their accounts for future use.[3]  Indeed, WSI's records show that O'Malley accrued 2.8 rewards from her July 11, 2025 purchase, and Reilly accrued 6.9 rewards from her July 14, 2025 purchase.  (*Id.* ¶¶ 15-16.)

Plaintiffs' July 2025 purchases thus cannot be dismissed as one-time purchases of goods.  As detailed above, both Plaintiffs were loyalty members who had years-long purchasing histories with WSI, with many transactions made while logged into their loyalty rewards.  (*Id.*)  O'Malley's account history reflects not only purchases across WSI's portfolio of brands, but also three (3) separate returns.  (*Id.* ¶ 15.)  Both were logged into those accounts at the time of their July 2025 purchases.  (*Id.* ¶¶ 15-16.)  And notably, several purchases even occurred ***after*** the July 2025 visits that triggered this action.  (*Id.*)

## III.   THE COURT SHOULD COMPEL ARBITRATION

### A.   Legal Standard

The Federal Arbitration Act ("FAA") governs the arbitration provision.  The Terms provide that "[t]he Federal Arbitration Act and federal arbitration law apply to this agreement."  (Smit Decl. ¶ 11, Ex. C.)  *See Nielsen Contracting, Inc. v. Applied Underwriters, Inc.*, 22 Cal. App. 5th 1096, 1106 (2018).  The FAA embodies a strong national policy favoring arbitration.  *AT&T Mobility LLC*

---

[3] WSI offers consumers the opportunity to participate in The Key Rewards loyalty program, which offers rewards and benefits for shopping with WSI.  (Smit Decl. ¶ 12.)  The Key Rewards program has two tiers:  (a) Gold Key Rewards, which is tied to WSI's branded credit cards; and (b) Silver Key Rewards, which is not tied to WSI's branded credit cards.  (*Id.*)  Relevant here, the Silver Key Rewards (non-credit card) loyalty account offers reward members 2% back in rewards for all purchases made while logged into the account, along with other exclusive benefits.  (*Id.*)  Once a Silver Key Rewards member earns $10 or more in rewards, WSI will send a reward code for use towards future transactions.  (*Id.*)

*v. Concepcion*, 563 U.S. 333, 345 (2011).  Under the FAA, arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  The FAA "leaves no place for the exercise of discretion."  *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985).  Thus, courts must compel arbitration if (1) a valid agreement to arbitrate exists, and (2) the dispute falls within the scope of that agreement. *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 564–65 (9th Cir. 2014); *see also* 9 U.S.C. § 4.

### B.    A Valid Agreement To Arbitrate Exists

Federal courts apply ordinary state-law principles governing contract formation to determine whether an arbitration agreement exists.  *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).  These courts generally look to the law of the forum state to determine the applicable law.  *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014).  Here, the Terms contain an enforceable California choice-of-law provision[4] (Smit Decl. ¶ 11, Ex. C), and California law therefore governs questions of contract formation.

Under California law, "a contract exists where the parties mutually manifest assent." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022).[5]  "Mutual assent may be manifested by written or spoken words, or by conduct, and acceptance of contract terms may be implied through action or inaction." *Knutson*, 771 F.3d at 565. These principles "apply with equal

---

[4] California courts honor a choice-of-law provision where the chosen state has a substantial relationship to the parties or their transaction or there is any other reasonable basis for the chosen law.  *See, e.g.*, *Hoffman v. Citibank, N.A.*, 546 F.3d 1078, 1082 (9th Cir. 2008); *Hansen v. Integrity Assets LLC*, 2021 WL 5999317, at *3 (C.D. Cal. Dec. 20, 2021).  Both exist where one party is a resident of the chosen state.  *See, e.g.*, *ABF Capital Corp. v. Osley*, 414 F.3d 1061, 1065 (9th Cir. 2005); *In re Facebook Biometric Info. Privacy Litig.*, 185 F. Supp. 3d 1155, 1168-69 (N.D. Cal. 2016).  Here, O'Malley and WSI are California residents.  (FAC ¶¶ 1, 8, 10.)  Thus, California law applies unless "the party asserting the law of an alternate state can establish both that the chosen law is contrary to a fundamental policy of the alternate state and that the alternate state has a materially greater interest in the determination of the particular issue." *Nanometrics, Inc. v. Optical Sols., Inc.*, 2019 U.S. Dist. LEXIS 35246, at *21 (N.D. Cal. Mar. 5, 2019) (internal quotations omitted).

[5] Even if this Court applied Virginia law to questions of contract formation, the result would be the same—an agreement to arbitrate exists.  *See Gillam v. Branch Banking & Trust Co. of Virginia.*, 2018 WL 3744019, at *2 (E.D. Va. Aug. 7, 2018) ("Virginia contract law requires the standard elements of offer, acceptance, and consideration for the formation of a valid contract."); *id.* ("Contract formation [under Virginia law] requires mutual assent of the parties, which 'may be inferred from the acts and conduct of the parties.'" (citation omitted)).

---

Case No. 3:26-cv-01276-RFL

SMRH:4896-2645-8531.6                    MOTION TO COMPEL ARBITRATION

force to contracts formed online." *Berman*, 30 F.4th at 855-56. "Thus, if a website offers contractual terms to [a user], and a user engages in conduct that manifests her acceptance of those terms, an enforceable agreement can be formed." *Id*. at 856.

At one extreme of online contracting lies "clickwrap" agreements, where "a website presents . . . specified contractual terms on a pop-up screen and users must check a box explicitly stating 'I agree' in order to proceed." *Oberstein v. Live Nation Entm't, Inc.*, 60 F.4th 505, 513 (9th Cir. 2023) (internal quotations omitted). At the other end of the spectrum are less likely to be enforced "browsewrap" agreements, where "a website offers terms . . . disclosed only through a hyperlink [usually at the bottom of a page] and the user supposedly manifests assent to those terms simply by continuing to use the website." *Berman*, 30 F.4th at 856. The more common agreement, commonly referred to as a "modified clickwrap" [6], is one falling between these "extremes" and is analyzed under an objective-reasonableness standard. *Oberstein*, 60 F.4th at 513. Under this standard, an agreement exists where: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests assent to those terms by taking that action. *Berman*, 30 F.4th at 856.

*Reasonably Conspicuous Notice*. The first inquiry is whether "'the website provides reasonably conspicuous notice of the terms to which the consumer will be bound.'" *Godun v. JustAnswer LLC*, 135 F.4th 699, 709 (9th Cir. 2025) (quoting *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1018 (9th Cir. 2024). "This test has two aspects: the visual design of the webpages and the context of the transaction." *Id*. "Both aspects 'should be considered together.'" *Id*. (quoting *Chabolla*, 129 F.4th at 1155). The visual design of a webpage "is a matter of whether an advisal is 'displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it.'" *Godun*, 135 F.4th at 709 (quoting *Berman*, 30 F.4th at 856). This is "a visual and aesthetic analysis" that "largely centers on . . . the 'visual aspects of the notice' within the 'overall screen design.'" *Id*. (quoting *Keebaugh*, 100 F.4th at 1019). The visual design

---

[6] *See, e.g.*, *White v. Ring LLC*, 2023 WL 1097554, at *4 (C.D. Cal. Jan. 25, 2023); *In re Ring LLC Priv. Litig.*, 2021 WL 2621197, at *5 (C.D. Cal. June 24, 2021).

analysis is "fact-intensive" and "informed by the 'totality of the circumstances.'" *Godun*, 135 F.4th at 709 (quoting *Oberstein*, 60 F.4th at 514). This is not simply a measurement of the font size or volume of content on the screen. It requires one to evaluate how a user would navigate through the page to get to the place where the assent action occurs and evaluate how the notice would fit into that flow. *See Bender v. Twilio Inc.*, 2025 WL 2308484, at *3-4 (N.D. Cal. Aug. 11, 2025) (noting that "the context of the transaction" and the "placement of the notice" as a "whole" drive the reasonably conspicuous inquiry, and finding notice reasonably conspicuous where the welcome page presented the advisal "in a conspicuous font, set apart in high contrast from the background, without requiring the user to scroll to see it," and the Terms and Privacy Policy appeared underlined and in a readable font directly below the account-creation button). Indeed, while the Ninth Circuit has "discussed certain factors relevant to [the] visual analysis of webpages and hyperlinks, such as the location of the advisal on the webpage or the font size, color, and contrast (against the page's background)[,]" it has "not created a checklist for website designers" or established "per se design rules that must be followed" to form a contract or "per se rules about what's necessarily inadequate, either" – checklists and rules that "would undermine the fact-intensive, totality-of-the-circumstances nature of the analysis." *Godun*, 135 F.4th at 709-10. "At bottom, when visually analyzing the conspicuousness of an advisal and any hyperlinks, courts must be tuned to the expectations of a reasonably prudent internet user." *Id.* at 710. "A hefty dose of common sense goes a long way" in undertaking this analysis. *Id.* In other words, how would the user actually use the page to get to the assent action. Since people generally read top to bottom, a notification that contains a hyperlink to the terms in question that sits immediately above the assent action, e.g. the "Place Order" button, as is the case here, is generally preferable to other locations.

Some courts will also consider, as a non-dispositive factor, whether the type of transaction contemplates entering into a "continuing forward-looking relationship that would be governed by terms and conditions." *Godun*, 135 F.4th at 710 (quotations and citation omitted). Courts are more likely to find assent where a user anticipates "some sort of continuing relationship" than where a user "simply purchases goods or avails herself of a one-time discount offer." *Chabolla v. ClassPass Inc.*, 129 F. 4th 1147, 1155 (9th Cir. 2025). That said, in the modern ecommerce transaction, it

-8-

should be undisputed that users care about whether they have a right to return or exchange products and to have them actually delivered to them if they contract for delivery (the very subject matter of this action).   Nevertheless, the oft-cited hallmark of an ongoing retail relationship where a continuing relationship is not only expected, but is invested in by the consumer, is a loyalty program where the consumer obtains benefits in a transaction to be redeemed at a later date.  *See Juhyun So v. Hyatt Corp.*, 2025 U.S. Dist. LEXIS 211395, at *14-15 (C.D. Cal. Aug. 25, 2025) (finding it undisputed that plaintiff "underwent a full registration process to sign up for the . . . rewards program" – a program with the "ongoing" purpose of "accumulat[ing] reward points and benefits for future redemption").

*Unambiguous Manifestation of Assent*.  The second inquiry addresses the act that manifests assent -- "whether any action taken by the internet user . . .  'unambiguously manifest[ed] his or her assent' to proposed contractual terms."  *Godun*, 135 F.4th at 710.  This part of the inquiry-notice test "is relatively straightforward."  *Oberstein*, 60 F.4th at 515.  A click of a button is unambiguous manifestation of assent if the user is explicitly advised that the act of clicking will constitute assent to the terms.  *Berman*, 30 F.4th at 857.

        1.     *Plaintiffs Online Purchases*

Here, to complete their purchases, Plaintiffs had to click the "Place Order" button.  Directly above that button, Plaintiffs were notified that, by clicking the button, they were agreeing to the hyperlinked "Terms of Use":

By placing an order, you are agreeing to our Privacy Policy. and Terms of Use..

**Place Order**

(Smit Decl. ¶¶ 9-10, Ex. A at 5, Ex. B at 5.)  A commonsense totality-of-the-circumstances analysis demonstrates that a reasonably prudent internet user would have seen the notice immediately above the Place Order button.

Although the notice font is smaller than the "Place Order" button's text, the short notice is

SMRH:4896-2645-8531.6
MOTION TO COMPEL ARBITRATION

"clear and legible." *Patrick v. Running Warehouse, LLC*, 93 F.4th 468, 477 (9th Cir. 2024).  The font need not be the same size; the notice must merely be in a "font [that] is large enough for a user to identify and read[.]" *Nail v. Lens.com, Inc.*, 2024 WL 3723912, at *4 (C.D. Cal. June 20, 2024).  Here it is also short, direct, and "not buried in fine print." *Berman*, 30 F.4th at 857.[7]  Moreover, users are aware that the notice contains a link to the Terms because the phrase "Terms of Use" is capitalized and underlined, "indicating [it is a] hyperlink[]." *Slaten v. Dick's Sporting Goods, Inc.*, 2024 WL 1136399, at *4 (C.D. Cal. Feb. 2, 2024) (capitalizing and underlining terms "indicat[ed] [it was a] hyperlink[].");  *see also Godun*, 135 F.4th at 714 (Nelson, J., concurring) (recognizing underlining as a customary means of denoting a hyperlink); *Ehrmantraut v. Safeway Inc.*, 732 F. Supp. 3d 1030, 1037 (D. Ariz. 2024) (same); *Asad v. Dick's Sporting Goods*, 2024 U.S. Dist. LEXIS 50970, at * 12 (C.D. Cal. Feb. 2, 2024) (same).  The "Terms of Use" hyperlink here was underlined in the first instance of assent and underlined and capitalized in the second instance of assent.  The hyperlink to the Terms is also in the same color and format as other clickable links on the page (*e.g.*, "Privacy Policy"), "suggesting clearly that it [was] a hyperlink."  *Patrick*, 93 F.4th at 477.

That the phrase "Terms of Use" did not use all capitals and was not rendered in some offsetting color such as blue does not mean a "reasonably prudent Internet user" in 2026 would not recognize it to be a clickable link.  *Berman*, 30 F.4th at 857.  While a "blue and underlined" hyperlink may be the "Platonic ideal … , that does not mean that a reasonably prudent internet user recognizes a hyperlink only when it's formatted that way or when it's a different color than the surrounding text." *Godun*, 135 F.4th at 714 (Nelson, J., concurring).  Indeed, the Ninth Circuit has confirmed that the fact that "links are not blue, underlined, or capitalized does not undercut the . . . conclusion" that there was "reasonably conspicuous notice."  *Patrick*, 93 F.4th at 477.  District courts applying the Ninth Circuit's decisions have reached the same conclusion.[8]

---

[7] *Berman* being a good example of buried in fine print and not immediately adjacent.

[8] *See, e.g.*, *Ghazizadeh v. Coursera, Inc.*, 737 F. Supp. 3d 911, 922-29 (N.D. Cal. 2024) (hyperlinks in same black color as notice sufficient) ; *Nail*, 2024 WL 3723912, at *4 (rejecting argument that notice was insufficient because "hyperlinks [were] black and underlined instead of being a bright blue color"); *Lincoln v. MX Techs., Inc.*, 2024 WL 3274831, at *2 n.3 (E.D. Cal. July 2, 2024) (rejecting argument that links were not conspicuous because they were not "color[ed]");

SMRH:4896-2645-8531.6                                                MOTION TO COMPEL ARBITRATION

Additionally, the notice was rendered in black font against a light background, and was not hidden, obscured, or "buried at the bottom of the page or in some other impermissibly inconspicuous place," (*Slaten*, 2024 WL 1136399, at *4), or otherwise blended into the contrasting white background.   *Godun*, 135 F.4th at 711-12 (finding "gray-on-gray presentation" of notice and background "suggests" notice "is inconspicuous").   Likewise, the Order Summary page, where Plaintiffs would have clicked the "Place Order" button, "was not 'crowded' with extraneous visuals" that distracted from the Terms' notice.  *Massel v. Successfulmatch.Com*, 2025 WL 2452371, at *1 (9th Cir. Aug. 26, 2025).  And the few necessary visual elements were "set off" from the notice "by ample white spacing[.]"  *Pizarro*, 2022 WL 3357838, at *3.

The notice was also presented "in the natural flow of [Plaintiffs'] actions" *Massel*, 2025 WL 2452371 (quotations omitted).  The notice was "located directly on top" of the necessary action button (*Oberstein*, 60 F.4th at 517), "precisely where a user would expect it within the natural visual path of completing the [purchase] process."  *Morrison v. Yippee Ent., Inc.*, 2025 WL 2389424, at *1 (9th Cir. Aug. 18, 2025).  And the notice's placement directly above the action button Plaintiffs had to direct their eyes to ensured that a reasonably prudent internet user would have seen it.  *Snow v. Nectar Brand, LLC*, 2023 WL 2558544, at *2 (C.D. Cal. Mar. 2, 2023) (conspicuousness supported by fact that consumer "must direct her eyes to the large, vibrant 'Place Order' button directly below the T&Cs"); *see also Ghazizadeh*, 737 F. Supp. 3d at 929 (placement of notice "directly below . . . the button . . . draws attention to the notice"); *Nail*, 2024 WL 3723912, at *3 (notice sufficient where it "presented directly below a bright red button that the user" had to "identify and click to continue . . . the ordering process").[9]

Courts have repeatedly found similar webpages sufficient to establish the existence of an

*Ehrmantraut*, 732 F. Supp. 3d at 1037 (noting that "there is no specific 'color test' employed by the Ninth Circuit" and finding underlined black hyperlink "the same color text as the rest of the notice" sufficient); *Pizarro v. QuinStreet, Inc.*, 2022 WL 3357838, at *3 (N.D. Cal. Aug. 15, 2022) (grey hyperlink "the same color as the rest of the textual notice" was "underlined and adequately contrasted with the white background, such that a user would not 'be required to hover their mouse over otherwise plain-looking text or aimlessly click on words on a page in an effort to ferret out hyperlinks'") (quoting *Berman*, 30 F.4th at 857)).

[9] The notices in *Nail*, *Slaten*, *Pizarro*, *Bender*, and *Ghazizadeh* are included as attachments to the Declaration of P. Craig Cardon ("Cardon Decl.").  (*See* Cardon Decl., Exs. A-E.)

-11-

Case No. 3:26-cv-01276-RFL

MOTION TO COMPEL ARBITRATION

agreement. *See*, *e.g.*, *Patrick*, 93 F.4th at 477 (finding agreement to be bound where defendant "includes explicit notice on the final order review page, directly . . . below the button [plaintiff] tapped to complete his purchase."); *Ross v. Shutterfly Lifetouch, LLC*, 2021 WL 4776666 (N.D. Cal. Oct. 13, 2021) (holding contract enforceable where user clicked "Submit Payment," and directly above the button, the page stated: "By clicking 'Submit Payment' I agree to the Privacy Statement and Terms and Conditions . . . "); *Lee v. Ticketmaster L.L.C.*, 2019 WL 9096442, at *1 (N.D. Cal. Apr. 1, 2019), *aff'd*, 817 Fed. App'x. 393 (9th Cir. 2020) (same where user clicked "Place Order" button directly above website statement that "informed the user that 'continuing past this page' (i.e., placing an order) would indicate assent to the [hyperlinked] terms."[10, 11]

Given the long line of cases holding that similar agreements were enforceable, the Website told Plaintiffs that by clicking the "Checkout" and the "Place Order" buttons, they were agreeing to be bound by the hyperlinked Terms. By proceeding with their purchases (*i.e.*, clicking the "Place Order" button), Plaintiffs unambiguously manifested assent to the Terms. *See*, *e.g.*, *Patrick*, 93 F.4th at 474, 477 (plaintiff "manifested assent" to terms of use by clicking "PLACE ORDER" button

---

[10] *See also Dupler v. Orbitz, LLC*, 2018 WL 6038309, at *1-3 (C.D. Cal. July 5, 2018) (same where website text putting user "on notice of the [hyperlinked] Terms of Use" was "located directly above the 'Complete Booking' button"); *Moule v. United Parcel Serv. Co.*, 2016 WL 3648961, at *4, 12 (E.D. Cal. Jul. 7, 2016) (same where user clicked "Yes," and above the button the page stated: "By clicking the Yes button, you agree to the UPS Tariff/Terms and Conditions," and the terms and conditions were hyperlinked); *Crawford v. Beachbody, LLC*, 2014 WL 6606563, at *3, 6-7 (S.D. Cal. Nov. 5, 2014) (same where user clicked "Place Order," and directly above the button the page stated: "By clicking *Place Order* below, you are agreeing that you have read and understand the . . . Terms and Conditions," which were hyperlinked)

[11] WSI disagrees with the holding in *Rushing v. Williams-Sonoma, Inc.*, No. 16-cv-01421-WHO, 2025 WL 2391394 (N.D. Cal. Aug. 18, 2025), and is currently appealing that decision. *See Rushing v. Williams-Sonoma, Inc.*, No. 25-5252 (9th Cir. Nov. 24, 2025). *Rushing* presented a materially distinct situation in which WSI sought to compel arbitration across multiple, broadly defined categories of purchasers — including rewards members and gift registry participants — for absent class members spanning a period of more than fifteen years. The present case is fundamentally different. Here, WSI moves to compel arbitration against specific, named plaintiffs whose individual purchase and membership histories are identifiable and documented, each of which evidences a clear and enforceable agreement to arbitrate claims with WSI. (Smit Decl. ¶¶ 5, 8, 15-16.) Indeed, earlier in the same *Rushing* case, when the court was presented with a Motion to Compel a single named plaintiff (*see* Dkt. No. 219), such that her direct engagement could be addressed, Judge Orrick granted the motion based upon the process for placing an online order. *See Rushing*, Dkt. No. 252.

"[i]mmediately adjacent" to the "statement: "By submitting your order . . . you agree to our privacy policy and terms of use").

### 2.     *Plaintiffs Are Loyalty Rewards Members*

Plaintiffs registered for a non-credit card loyalty rewards account on January 16, 2022 and July 11, 2021, respectively.  (Smit Decl. ¶¶ 15-16.)  To create such an account, Plaintiffs were required to click the "SUBMIT" button above the statement "[b]y submitting, you agree to our Terms and Conditions."  (*Id.* ¶ 13.)  Further, neither O'Malley's July 11, 2025 transaction nor Reilly's July 14, 2025 transaction can be dismissed as one-time purchases of goods.  As detailed above (*see supra* Section II.C.), both Plaintiffs had years-long purchasing histories with WSI, with many transactions made while logged into their loyalty rewards accounts.  (Smit Decl. ¶¶ 15-16.)  O'Malley's account history is particularly illustrative:  it reflects not only purchases across WSI's portfolio of brands, but also multiple returns, further evidencing an ongoing and recurring customer relationship.  (*Id.* ¶ 15.)  Both were logged into those accounts at the time of their July 2025 purchases. (*Id.* ¶¶ 15-16.)  Several purchases even occurred ***after*** the July 2025 visits that triggered this action*.*  (*Id.*)  This history of ongoing membership and rewards accumulation, plus repeat purchasing demonstrates that both Plaintiffs anticipated a continuing, forward-looking relationship with WSI—not the isolated, one-off transaction the FAC portrays.  *Compare Oberstein*, 60 F. 4th at 517 ("the context of this transaction, requiring a full registration process, reflected the contemplation of 'some sort of continuing relationship' that would have put users on notice for a link to the terms of that continuing relationship" (citation omitted)), *and Morrison*, 2025 WL 2389424, at *2 (finding notice was reasonably conspicuous because "[a] reasonable user subscribing to Yippee's recurring streaming service would have contemplated some sort of continuing relationship that prompted scrutiny of the website for any contractual obligations or terms" (cleaned up)), *and Juhyun So*, 2025 U.S. Dist. LEXIS 211395, at *14-15 (finding notice was reasonably conspicuous where plaintiff "sign[ed] up for an ongoing, loyalty-based rewards program," with the purpose of "accumulat[ing] reward points and benefits for future redemption"), *with Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 464-65 (2021) (noting that "most consumers would not expect to be bound by contractual terms" when engaging in a "trivial" transaction like "the sale of

a single item, such as a pair of socks").

## C.     The Disputes Fall Within The Scope Of The Arbitration Agreement

The Terms reserve questions of scope and arbitrability for the Court. (Smit Decl. ¶ 11, Ex. C.) ("A court of competent jurisdiction will exclusively determine whether the parties have entered into a valid and enforceable agreement to arbitrate their Claims and the arbitrability of any Claim or counterclaim . . . ."). The FAA "embodies a clear federal policy in favor of arbitration." *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 719 (9th Cir. 1999). Courts must therefore indulge every presumption "in favor of arbitration" when determining whether a claim falls within the scope of an arbitration agreement. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 (1983). Arbitration provisions governing "all" claims, disputes, and controversies between the parties cover all claims without exception. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 357 (2011) (enforcing arbitration agreement governing "all" disputes that included class action waiver); *Morales v. Lexxiom, Inc.*, 2010 WL 11507515, at *14 (C.D. Cal. Jan. 29, 2010) (enforcing arbitration agreement governing "any" dispute because the language is "all-encompassing" and jury trial waiver set forth in all caps "could not be clearer").[12] "The party opposing arbitration bears the burden of establishing that the arbitration provision . . . does not encompass the claims at issue." *Tate v. Progressive Fin. Holdings*, 2017 U.S. Dist. LEXIS 176289, at *7 (C.D. Cal. Oct. 24, 2017).

There can be no question that O'Malley's alleged July 11, 2025 online transaction and Reilly's alleged July 14, 2025 online transaction giving rise to their claims in the FAC fall within the scope of the arbitration provision. The arbitration provision applies to "any controversies,

---

[12] California (and Virginia) law similarly require courts to read arbitration clauses broadly, and doubts as to the scope of an arbitration clause should "be resolved in favor of sending the parties to arbitration." *United Trans. Union, AFL/CIO v. Southern Cal. Rapid Transit Dist.*, 7 Cal. App. 4th 804, 808 (1992); *City-to-City Auto Sales, LLC v. Harris*, 78 Va. App. 334, 344 (2023). The presumption of arbitrability grows even stronger when the arbitration clause is broad, sweeping in "any claims arising from or relating to" an agreement or "any claims" between the parties. *Wolitarsky v. Blue Cross of Cal.*, 53 Cal. App. 4th 342, 348 (1997). For example, agreements calling for the arbitration of "all claims" or "all controversies" require arbitration not only of contract claims, but also tort claims. *See, e.g.*, *EFund Capital Partners v. Pless,* 150 Cal. App. 4th 1311, 1322 (2007); *Izzi v. Mesquite Country Club*, 186 Cal. App. 3d 1309, 1315 (1986) *superseded by statute on other grounds*.

SMRH:4896-2645-8531.6                                          MOTION TO COMPEL ARBITRATION

claims, counterclaims, or other disputes between [Plaintiffs] and [WSI] or [Plaintiffs] and a third-party agent of [WSI]." (Smit Decl. ¶ 11, Ex. C.) Thus, the arbitration provision is more than broad enough to cover this dispute.

## IV.   CONCLUSION

WSI requests that the Court grant this Motion. To the extent the Court finds a general dispute of material fact regarding formation, WSI demands a jury trial under FAA section 4.

Dated:  April 24, 2026                    SHEPPARD, MULLIN, RICHTER & HAMPTON LLP


By            /s/ *P. Craig Cardon*
                        P. CRAIG CARDON
                        JAY T. RAMSEY
                        RANA SALEM

                        *Attorneys for Defendant*
                        WILLIAMS-SONOMA, INC.